**The relief described hereinbelow is SO ORDERED.**

**Signed January 03, 2024.**

_____
**CHRISTOPHER G. BRADLEY**
**UNITED STATES BANKRUPTCY JUDGE**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| DAMON CAPITAL, LTD., | § | CASE NO. 23-10063-cgb |
|    Debtor. | § | (Chapter 11) |

### OPINION AND ORDER ON FEE APPLICATION

### Introduction

In this single asset real estate case, the oversecured lender submitted an application for approval of its attorney's fees. The debtor objected on various bases. Because the Court finds that the rate charged and the time spent were reasonable and fell within the scope of the applicable provisions in the debtor's contract with the lender and in the confirmed reorganization plan, the Court approves the fees, with the exception of some fees related to unnecessarily redacted time sheets.

1

## Procedural Background

On September 29, 2023, counsel for 100 E. 7th Street Lender LLC (the "Lender") filed a Fee Application pursuant to 11 U.S.C. §506(b) and Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Fee Application"), seeking approval of $62,257.50 in professional fees and reimbursement of $4,754.90 in expenses.[1] The Fee Application included invoices with time entries supporting the request for fees and expenses, although many time entries were redacted in part. On October 19, 2023, Damon Capital, Ltd. (the "Debtor") filed an Objection to the Lender's Fee Application Pursuant to 11 U.S.C. §506(b) (the "Objection").[2] On November 27, 2023, the Court conducted a hearing (the "Hearing") on the Fee Application and took the matter under advisement. At the Hearing, the Court ordered supplemental briefing by the parties, regarding the Lender's time entry redactions and the Lender's request for fees in connection with the Hearing. On December 1, 2023, the Debtor filed its Post-Trial Briefing on Objection to Lender's Fee Application (the "Post-Trial Brief").[3] On December 6, 2023, the Lender filed a Supplement to Fee Application pursuant to 11 U.S.C. §506(b) and Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Supplemental Fee Application").[4] In the Supplemental Fee Application, the Lender requested $4,720.90 in professional fees for services rendered in connection with the Hearing.[5] On December 14, 2023, the Court conducted a brief second hearing, and the Debtor objected to the reasonableness of the professional fees requested in the Supplemental Fee Application.

The Court has considered the Fee Application, the Objection, the Debtor's Post-Trial Brief, the Supplemental Fee Application, the evidence presented, and the statements and arguments of counsel at both hearings. The Court finds that the Fee Application should be granted in part and denied in part, for the reasons set forth below.

---

[1] Dkt. No. 103.
[2] Dkt. No. 105.
[3] Dkt. No. 118.
[4] Dkt. No. 119.
[5] *Id.*

## Jurisdiction and Authority

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334. The Court has constitutional authority to determine this matter because it arises from the claims allowance process.[6]

## Legal Background

Section 506(b) of the Bankruptcy Code permits an oversecured creditor to seek compensation for any reasonable fees, costs or charges under the contract.[7] Section 4.03(c) of the Debtor's confirmed plan of reorganization (the "Plan")[8] specifies that the Lender's Claim "is an oversecured claim and is entitled to recover . . . reasonable fees and expenses as provided in the contract."[9] Accordingly, what this Court has to assess is whether the requested fees and expenses are recoverable under the governing contractual provisions and, if so, whether those fees and expenses are reasonable within the meaning given to that term in bankruptcy law.

The contract appears to contain two potentially applicable provisions. The first is this:

> 9. Other Agreements
> (a) Expenses. During the term of this Agreement and for as long as any amounts remain outstanding under the Loan, Borrower agrees to pay directly, or promptly reimburse Lender for its payment . . . (ii) of all reasonable expenses incurred by Lender in connection with the Loan . . . [10]

The second is this:

> 12. Miscellaneous
> (j) Expenses. Borrower shall pay all costs and expenses (including, without limitation, reasonable attorney's fees) in connection with (i) any action required in the course of

---

[6] *Stern v. Marshall*, 564 U.S. 462, 474-478 (2011).

[7] Section 506(b) "provides four basic requirements for allowance of fees, costs or charges to a secured creditor: '(1) the claim must be an allowed secured claim; (2) the creditor holding the claim must be over-secured; (3) the entitlement to fees [costs or charges] must be provided for under some agreement or state statute; and (4) the fees [costs or charges] sought must be reasonable.'" *In re Shree Mahalaxmi, Inc.*, 522 B.R. 899, 906 (Bankr. W.D. Tex. 2014) (quoting *In re Pan Am. Gen. Hosp., LLC,* 385 B.R. 855, 862 (Bankr. W.D. Tex. 2008)).

[8] Debtor's Amended Plan of Reorganization Dated June 29, 2023, Dkt. No. 73.

[9] *Id.*

[10] Dkt. No. 33, Exhibit B, ¶ 9.

3

> administration of the indebtedness and obligations
> evidenced by the Loan Documents, and (ii) any action in
> the enforcement of Lender's rights upon the occurrence of
> an Event of Default.[11]

The burden is on the proponent of the fees to defend them as reasonable.[12] "[A]ccording to the Fifth Circuit, 'courts have broad discretion in awarding fees.'"[13] This discretion is guided by a well-established analytical framework and set of factors:

> In the Fifth Circuit, a three-step approach is used to determine the reasonableness of attorneys' fees for over-secured creditors: "(1) determine the nature and extent of the services supplied by the attorney with reference to the time and labor records submitted; (2) ascertain the value of the services; and (3) briefly explain the findings and the reasons upon which the award is based." *In re Pan Am. Gen. Hosp.*, 385 B.R. at 868 (citations omitted). Additionally, a court reviewing the reasonableness of a secured creditor's fees should consider the twelve Johnson factors, "the circumstances surrounding the case, the manner of its administration", and whether duplication of services occurred. *In re Pan Am. Gen. Hosp.*, 385 B.R. at 869[.]
>
> The factors set out in *Johnson* include: (1) time and labor required, (2) novelty and difficulty of the questions, (3) skill requisite to perform the legal service properly, (4) preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) undesirability of the case, (10) experience, reputation and ability of attorneys, (11) nature and length of the professional relationship with the client, and (12) awards in similar cases. *See Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 717–19 (5th Cir.

---

[11] Dkt. No. 33, Exhibit B, ¶ 12.

[12] *Sylvester v. Chaffee McCall, L.L.P. (In re Sylvester)*, 23 F.3d 543, 549-50 (5th Cir. 2021).

[13] *Shree Mahalaxmi, Inc.*, 522 B.R. at 907 (quoting *In re Babcock & Wilcox Co.,* 526 F.3d 824, 828 (5th Cir. 2008) (citation omitted)).

1974) (identifying the twelve factors that are known as the *Johnson* factors).[14]

The Court has followed this approach, and has considered the *Johnson* factors, in assessing reasonableness in the analysis below.

## Analysis

### A. This was largely a two-party bankruptcy case, and the Debtor's own posture and activities contributed significantly to the Lender's fees.

The Court considers the Debtor's primary objections more particularly below, but it will address several points from the outset.

First, the Debtor objects to the fact that the Lender's fees were approximately twice what the Debtor's were: $62,257.50 in fees and $4,754.90 in expenses for the Lender, versus $36,232.50 in fees and $1,804.05 in expenses[15] for the Debtor.[16] This discrepancy would raise an eyebrow in most cases, but the point is less striking in this case. An important part of the context here is that the Lender was not just one creditor among many. This was a single asset real estate case, and the two parties that mattered were the Debtor and the Lender. And, as in most Chapter 11 cases, the Debtor has a lot of control (even if the Debtor's powers are somewhat restricted by the provisions governing single asset real estate cases[17]). The Lender had to stay on its toes or risk losing its rights. And the Lender's timely and firm action had significant effects on its treatment in the case.

Second, the Debtor played a role in the size of the Lender's attorney's fees. Although everyone deported themselves with professionalism and this was not a particularly messy case, a considerable portion of these fees were prompted by the Debtor's own actions. For instance, in the initial plan of reorganization, the Debtor sought to pay the Lender the contract rate of interest post-petition rather than the default rate; in addition, at times, the Debtor's conduct was somewhat haphazard within the bankruptcy proceeding as it made late filings and otherwise was less than

---

[14] *Shree Mahalaxmi*, 522 B.R. at 907 (some citations omitted).

[15] Dkt. No. 112.

[16] This does not count the Lender's supplemental fees, Dkt. No. 119, which were incurred after, and as a result of, the Objection.

[17] *See* §362(d)(3).

thoroughly compliant with its responsibilities.[18] In light of these realities, the Lender's vigilance was both reasonable and necessary. It engaged in discovery, including taking a deposition, which one imagines might not have been necessary in other cases where a more collaborative posture had been taken. Similarly, the Lender prepared actively for the lift-stay hearing on June 22, 2023, and as discussed below, given the vulnerability of its rights at that point in the bankruptcy, it was reasonable to do so.

Because of the way the Debtor prosecuted this case, the Lender was forced to take an active role, and there is no doubt that it did so very effectively. If the Debtor had wanted to minimize the fees that it would be obligated to pay on the Lender's behalf, it could and would have acted quite differently. The Debtor has to some degree made the bed that it has to sleep in.

## B. The Lender's professionals' rates were reasonable under the circumstances.

The Debtor has challenged the rates charged by the Lender's attorneys and paralegals. It argues that similarly or more experienced attorneys in the Austin-San Antonio market charge lower rates than those of the Lender's counsel.[19] As opposed to the rates of $590 and $455 for the Lender's primary attorneys, it proposes acceptable rates of $485 and $350 per hour (with similar reductions for paralegals).

In determining what rate is reasonable, one of the key questions that courts consider is: "What is the range of rates charged by attorneys of comparable competence for comparable services in the comparable community or marketplace?"[20] The Fifth Circuit has emphasized that "the attorneys' fees calculus

---

[18] The United States Trustee ("U.S. Trustee") filed a Motion to Dismiss or Convert because the Debtor had failed to timely file multiple Monthly Operating Reports. Dkt. No. 39. The Motion to Dismiss or Convert was resolved by an Agreed Order between the U.S. Trustee and the Debtor. *See* Dkt. No. 68.

[19] This analysis focuses on attorneys because that was the focus in the Hearing and by far the bulk of the fees. But the Court has also reviewed the paralegals' rates and finds that they are reasonable under the circumstances.

[20] *In re Temple Retirement Community*, 97 B.R. 333, 342 (Bankr. W.D. Tex. 1989). As noted, this framing of the issue distills the emphasis of the Fifth Circuit across numerous cases. *In re El Paso Refinery, L.P.*, 257 B.R. 809, 831 n. 40 (Bankr. W.D. Tex. 2000) (collecting Fifth Circuit citations, including *Transamerican Natural Gas Corp. v. Zapata Partnership, Ltd. (In re Fender)*, 12 F.3d 480, 487 (5th Cir. 1994), *Shipes v. Trinity Indus.*, 987 F.2d 311, 319–20 (5th Cir. 1993), and *Lawler v. Teofan (In re Lawler)*, 807 F.2d 1207, 1211 (5th Cir. 1987)). *See also Pan Am. Gen. Hosp.*, 385 B.R. at 874-75.

is a fact-intensive one and its character varies from case to case."[21] Defining the relevant community for a particular case can be difficult,[22] as can determining the range of rates for "attorneys of comparable competence."

In assessing reasonableness, this Court's touchstones are not what the judge personally would pay, or who the judge personally would retain, or who the judge thinks the Lender should have retained, or who the judge thinks is the best deal in town. Rather, the Court must consider how reasonable parties in this community can and do act in situations like this one.[23] One way to frame it is: does the Court think these rates are what a reasonable lender active in this "community or marketplace" would pay for these attorneys if it were responsible for its own fees and not able to impose them on a bankruptcy estate? Here, based on the Court's careful assessment of the facts and circumstances, including the testimony of both counsel for the Debtor and the Lender, the answer is yes,[24] whether the community is defined narrowly as the Austin-San Antonio legal market or a broader, statewide (or even national) market.

First, the Court finds that counsel for the Lender credibly established that the rates charged were within the range of reasonableness for professionals in the Austin-San Antonio market for comparable levels of experience and skill. Experience and skill are not just reflected in years since graduation from law school, but, among other things, in actual substantive involvement in cases, particularly in complex matters, as well as in numerous other lawyerly activities. Among other relevant qualifications and activities, lead counsel for the Lender convincingly showed that he has built skills by being trained by, and practicing opposite, some of the most skilled and experienced practitioners in this area—including, of course, the counsel for the Debtor in this case. Perhaps the rates are somewhat on the higher end of the local scale, but the Court finds that they are firmly within the realm of

---

[21] *Hopwood v. Texas*, 236 F.3d 256, 281 (5th Cir. 2000).

[22] *See, e.g.*, *Shree Mahalaxi*, 522 B.R. at 908-09; *Temple Retirement*, 97 B.R. at 342-43; *Pan Am. Gen. Hosp.*, 385 B.R. at 874-75.

[23] *Cf. In re Nordic Aviation Capital Designated Activity Co.*, No. 21-33693, 2022 WL 10716251, at *18 (Bankr. E.D. Va. Oct. 18, 2022) ("The Court must … look at whether the rates charged are consistent with those set in the relevant market. The marketplace will establish the benchmark for what is a reasonable rate of compensation in any given case. The market rate will be set for the most part by the amount clients are willing to pay for professional services." (footnote omitted)).

[24] In this case, the testimony was that the Lender paid these fees as they came due, leaving itself to seek reimbursement later, which is never certain. This suggests that the Lender was not merely counting on the bankruptcy estate.

reasonableness for these lawyers and on this type of case, even when considering only the Austin-San Antonio legal market.

Second, the Court is not certain that the analysis should be restricted to the Austin-San Antonio legal market alone. Austin and the surrounding areas have seen massive growth and development in recent years, including in real estate. The rapid economic growth and investment may bring more out-of-town lenders—such as the Lender in this case—into transactions and may affect the relevant "community standards" to be used in assessing the reasonable range of rates.[25]

The Debtor distinguishes several cases cited by the Lender on the grounds that the initial lender in this case was local, with local counsel, whereas in those cases, the debtors knew they were dealing with national lenders with a national counsel;[26] and on grounds that the sums at issue here were smaller than in those cases. The Debtor's argument is generally well taken, and such facts are relevant. Nonetheless, this case was not a walk in the park. It required skilled, nimble counsel; it involved a range of bankruptcy and litigation skills, hotly contested briefing and hearings, discovery, and generally, the handling of a debtor that, at a minimum, did not have a collaborative approach to its relationship with its lender. The Lender reasonably sought counsel who would handle those demands expertly. In addition, given the boom from which the regional real estate market has benefitted, it is not entirely unexpected when out-of-town lenders become involved in seven-figure commercial real estate loans in rapidly developing areas like Georgetown. Such parties may be more likely to hire counsel from elsewhere in the state or beyond. They may do so when they are paying the fees themselves, and in some circumstances, they may be entitled to do so when the fees are being paid out of a bankruptcy estate. (Within limits, of course—not all professional rates will be reasonable, just because someone somewhere is willing to pay them.[27])

---

[25] *Shipes v. Trinity Industries,* 987 F.2d 311, 319–20 (5th Cir. 1993) (instructing the court to "select an appropriate hourly rate based on prevailing community standards for attorneys of similar experience in similar cases").

[26] *Shree Mahalaxmi,* 522 B.R. at 908 (approving national counsel rates because "[t]he Court agrees . . . that national representation by a firm that specializes in representing special servicers should have been expected when borrowing money from a national financing system.").

[27] The Fifth Circuit has instructed that "[h]ourly rates are to be computed according to the prevailing market rates in the relevant legal market, not the rates that lions at the bar may command." *Hopwood*, 236 F.3d at 281.

8

In this case, the Court is spared the task of assessing whether major-market big-firm rates—which can be double (or more) the rates at issue here—would have been compensable. The rates at issue here are well within the range of reasonableness for a case like this one and under these circumstances, whether the relevant market is defined narrowly or more broadly. The point is merely that reasonableness and its meaning in a given time and place has to be assessed and re-assessed on an ongoing basis.[28]

### C. Billing on the lift-stay (and related work) was reasonable.

The Debtor objects to the fees classified as work on the motion to lift the automatic stay, seeking disallowance of more than half of the requested amount.[29] Among other things, it notes that this fee category appears to include work drafting a motion to dismiss that was not filed but that was "converted" to a motion to lift stay.

Prosecuting the lift stay motion required significant bankruptcy expertise. As discussed, this case was fairly contentious in that the Lender had to act expeditiously and relatively aggressively in order to protect its rights. Notably, in response to the lift stay motion, the Court found cause existed to lift the stay and entered an order conditionally lifting the stay.[30] Because the Debtor was able to treat the Lender's pre-petition proof of claim amount adequately through the confirmed Plan, the Lender did not proceed with foreclosure. But the Lender's lift-stay motion significantly helped its position, and thus served a valuable purpose. In the Hearing, the Lender also successfully demonstrated that the work required on the lift-stay motion was considerably more complex than the Debtor's characterization of it might suggest.

---

[28] Another bankruptcy court in this district put it like this:

> This court has observed in an earlier decision that "[m]any bankruptcy cases are often more regional or even national than they are local in scope, so that looking solely to the local community's range of rates would impose an unnecessarily parochial cap on the case." That observation is still valid, but it is harder today to say what the scope of a case really is, because even an otherwise local case in terms of employees or business operation may be a regional case in terms of its lenders. Courts should exercise some care before denying a given player their chosen choice of counsel based solely on the location (and billing rate) of the lawyer, and imposing local rates can have just that effect.

*Pan Am. Gen. Hosp.*, 385 B.R. at 874 (quoting *Temple Retirement*, 97 B.R. at 342) (additional citation and footnote omitted).

[29] Dkt. No. 105 at 3-4.

[30] Dkt. No. 71.

As for the fact that some of the lift-stay work appears to have initially been on a motion to dismiss: given the Debtor's acknowledged failures to keep up with some of its Chapter 11 duties early in the case, and the fact that single-asset real estate cases are not always a comfortable fit for Chapter 11 anyway, this was a reasonable project to work on at the time the work was performed, even if it was not filed as initially planned.[31] Naturally, given the closely related nature of the two forms of relief, much of the research and drafting for the motion to dismiss would also be applicable to a motion to lift stay.

In sum, the Court has considered the time billed on the lift-stay motion and finds that the Debtor has borne its burden of showing that it was reasonable and necessary.

### D. Billing for the disclosure statement and plan was reasonable.

The Debtor argues that the Lender's objections to the Disclosure Statement and Plan were "mostly non-substantive and unnecessary."[32] It argues that all but five hours of work in this category should be disallowed.

But the Lender's major objection appears to have been valid and to have resulted in a substantial amendment to the Plan. Having thrown some sharp elbows itself (including in its own initial plan), the Debtor can hardly be surprised that the Lender spent time carefully planning how to throw an elbow or two in return, to defend its interests.[33] Again, this is a situation where the Debtor's own actions required a significant reaction. While the Court emphasizes again that counsel appear to have acted professionally throughout this case, this was a "low trust" environment, and the Lender understandably took great care to review and to prepare its filings at this crucial stage of the case.

---

[31] Fees are assessed on the basis of objective reasonableness on a prospective basis at the time they were incurred. *See generally Barron & Newburger, P.C. v. Texas Skyline, Ltd. (In re Woerner)*, 783 F.3d 266, 276 (5th Cir. 2015).

[32] Dkt. No. 105 at 4.

[33] "Just because a secured creditor wishes not to cooperate with the estate does not mean that the fees incurred in taking adversarial measures are not 'reasonable.' . . . [R]easonableness within the purview of section 506(b) simply ensures that secured creditors not overstaff or unnecessarily duplicate work at the expense of the estate and its other creditors." *Pan Am. Gen. Hosp.*, 385 B.R. at 871.

The Court found the testimony of the Lender's counsel concerning this time to be credible, and the Court finds that the billing for review of the Disclosure Statement and Plan and for the objection to the Disclosure Statement were necessary and reasonable.

### E. Fees for suing the Debtor's principal on his guaranty were compensable under these circumstances.

The Debtor objected that the expenses and charges related to the state court guaranty suit should not be billed to the estate, because they were not sufficiently related to the bankruptcy estate. But the Court finds that work on the guaranty was within the scope of the compensable fees in this case. The confirmed plan (which functions as an order of the Court) states that the fees provided for in the contract are compensable. Similarly, §506(b) of the Code states that an oversecured party such as the Lender is entitled to "any reasonable fees, costs, or charges provided for under the agreement . . . under which such claim arose."[34]

These fees on the guaranty seem plainly within the scope of the governing contractual provisions. The action on the guaranty was initiated to enforce the Lender's rights, provided for in the loan documents,[35] to seek an alternative source of repayment when the Debtor had defaulted on its obligations. These fees were surely incurred "in connection with . . . any action in the enforcement of Lender's rights upon the occurrence of an Event of Default."[36] The Lender was therefore entitled, "under the agreement . . . under which [its] claim arose" to add these amounts to its claim.[37] And thus, under both §506(b) and the terms of the confirmed plan, the fees on the guaranty are therefore compensable.

---

[34] *Cf. Shree Mahalaxmi*, 522 B.R. at 914 (noting that §506(b) permits recovery of "any reasonable fees, costs, or charges," and that "there is no requirement that the fees be necessary to the administration of the case" and that "counsel for the creditor is not concerned with case administration, but rather with protection of his client's interests").

[35] Dkt. No. 33, Exhibit B.

[36] *Id*. at ¶ 12(j).

[37] Section 506(b).

The Debtor also objects to the inclusion of research expenses that are usually incurred on a flat-fee basis and therefore should not be attributed to clients. The Lender's counsel testified that the research expenses were actual costs incurred by his firm and that they are routinely billed to clients. The Debtor cast doubt on the merits of the some of the research topics as well, but the Lender satisfactorily explained the relevance in the Hearing. The Court finds these expenses and charges to be reasonable and approves them.

### F. Fees for perfection/recordation were compensable under these circumstances.

The Debtor challenges fees and expenses associated with perfecting the Lender's rights in the underlying real property. In its Objection, it states that "[t]hese fees were incurred for Lender to acquire the debt" and seeks disallowance of all of them.[38]

> For these fees, the Lender seeks payment under this provision of the contract:
>> Borrower shall pay all costs and expenses (including, without limitation, reasonable attorney's fees) in connection with (i) any action required in the course of administration of the indebtedness and obligations evidenced by the Loan Documents.[39]

Fee-shifting clauses should not be read expansively. They are subject to abuse, given that the party paying the fees is not the person retaining the lawyer or the person who the lawyer is working for. But the language here is broad in several respects: "all costs and expenses . . . in connection with . . . any action . . . in the course of administration."[40]

The action must be "required," however, which is perhaps a more meaningful limitation. The way the Court considers the meaning of this term, in context, is: would a reasonable lawyer representing the Lender tell the Lender that these steps are *necessary*—or merely *advisable*—steps to be taken "in the course of administration of the indebtedness and obligations evidenced by the Loan Documents"? This clause only covers the *necessary* steps. Here, the challenged activities seem plainly necessary. A lender would be acting quite unreasonably if it

---

[38] Dkt. No. 105 at 3.

[39] Dkt. No. 33, Exhibit B, ¶ 12(j). The Court believes that the activities might also be compensable under ¶ 9(a) of the contract, but the Lender did not cite this provision in the Hearing.

[40] *Id.* at ¶ 12(j). Note that contrary to the Debtor's assertion in its supplemental briefing, not just enforcement but also "administration" of the debt is covered by this provision.

failed to take steps to ensure that its secured loan was actually perfected sufficient to protect its secured status.

As for its relating merely to the acquisition: perfection, recordation, and similar acts can occur otherwise than merely in acquisition of a loan.[41] In addition, although recordation usually occurs with acquisition, it is distinct. In this context, the acquisition of debt is the process by which a new party enters into a contractual relationship with the debtor, usually by virtue of a transaction with the previous owner of the debt. By contrast, recordation or perfection is outward facing; it generally consists of the public acts that put the world on notice, or otherwise make the lender's rights "good against," parties other than the debtor.[42] Here, the Lender became the Lender by virtue of acquisition of the debt; recordation was not necessarily an integral part of that process. But recordation was a "required" part of the "administration" of the debt as acquired—it was necessary for the Lender to exercise its rights fully after acquisition. The Lender offered credible testimony that it is not seeking compensation for fees related to the actual purchase of the loan, which, it conceded, is not within the scope of this provision. But it convincingly urged that the sought-after recordation fees are different from those and are compensable. Recording the lien meets the "necessary" test here, and the challenged fees and expenses are compensable.

It is true that this might mean the Debtor would be subject to multiple "rounds" of similar fees and expenses if the loan was assigned repeatedly. But this does not mean the fees were unreasonable. The Court notes that there is no argument that the assignment of the contract was itself inappropriate.[43] Accordingly, the Debtor has to live with the deal it made in the contract, which as noted includes provisions for fairly broad reimbursement of fees and expenses. And this interpretation of those provisions is not absurd. These fees are relatively small, after all, and the Court believes that a rational debtor might well agree to pay such fees even at risk of having to pay them more than once if the loan was assigned (indeed, in the Court's experience, debtors do make such agreements routinely).

---

[41] Changes in the use, ownership, or division of the property are examples that readily come to mind, in which modification, renewal, supplementation, or amendment of recordation or perfection might be required.

[42] "The act or process of recording an instrument, such as a deed or mortgage, in a public registry. Recordation generally perfects a person's interest in the property against later purchasers (including later mortgagees), but the effect of recordation depends on the type of recording act in effect." RECORDATION, Black's Law Dictionary (11th ed. 2019).

[43] Indeed, the Court's own reading of the contract confirms that assignment appears permissible and contemplated.

### G. This matter not does reflect unduly thick staffing or duplication of effort.

The Debtor objects to several intra office conferences and generally suggests that time was excessive and reflective of merely "training" a junior lawyer to do tasks, which should not be compensable. The Court is mindful of cases that instruct that it "must be especially vigilant to examine whether the secured creditor's attorney has over-staffed the case or double billed for duplicative work."[44]

The staffing in this case was fairly lean: one partner and one associate, with much of the initial work done by the associate on matters like drafting and day-to-day case management. Based on the Lender's counsel's credible testimony, and the Court's careful review of the time sheets, the Court believes this staffing was appropriate and strikes a reasonable balance between leanness and quality control. The Debtor claims that some of the work was evidently "training" and thus should not count, but the Court does not see evidence of that. To be sure, it is possible that a less experienced attorney will take longer on drafting a particular motion due to unfamiliarity, but that is one reason their rates are lower than more experienced attorneys. And work product is often improved by a pair of fresh eyes to double-check citations, tighten up well-worn arguments or pleadings, or ask questions that sometimes even brilliant, veteran attorneys might overlook.

The Debtor also complains about a couple of consultations with other attorneys at the firm, but that time was not significant, and based on the credible testimony and evidence, these consultations seem reasonable to the Court. One selling point of larger firms is that attorneys can consult with other folks who may have particular experience or creative ideas for dealing with whatever issues have come up.

In general, the Court understands and shares the concern that has motivated several rulings disallowing fees for intraoffice conferences.[45] However, this Court would articulate its approach to intraoffice conferencing somewhat differently from those rulings. In the Court's view, the same principles govern participation in intraoffice conferences as any other professional services.

---

[44] *Pan Am. Gen. Hosp.,* 385 B.R. at 869.

[45] *See, e.g., In re King*, 546 B.R. 682, 727 (Bankr. S.D. Tex. 2016) ("It is excessive billing for both of these attorneys to charge time for the same conference with one another."); *In re Ridgeway*, No. 16-10643, 2018 WL 1116531, at *12 (Bankr. E.D. La. Feb. 27, 2018) ("For both attorneys to charge time for conferring between themselves is excessive.").

Because they can be an "easy" way for multiple attorneys to drive up their billable hours, intraoffice conferences are prone to abuse, and as a result, courts assessing reasonableness rightly pay particularly close attention to them. But at the same time, intraoffice conferences are often necessary and beneficial (and therefore compensable). They can help hone strategy, prevent mistakes, and improve the quality of legal services by pooling the experience and ideas of several attorneys rather than relying on only one. Sometimes lawyers are lone gunslingers, but more often they act as part of an integrated force. Generals do not lead troops into battle before testing their assessments and strategies in a council of war. Intraoffice meetings can and should be a way for a team of professionals to criticize, coordinate, and collaborate with one another. Not every issue warrants group attention, but in appropriate matters, intraoffice conferences are a vital tool. When that is so, fees for participating in them are compensable.

The burden is always on the proponent of fees to show that activities are compensable. When more than one professional is involved, the demonstration must include support for each professional's involvement. Because billing for intraoffice conferences is easily abused, courts charged with assessing the reasonableness and necessity of intraoffice conferences have understandably scrutinized them carefully. This Court will do so too. But when conferences are shown to be necessary and beneficial, they can and should be compensated.

In this case, the Court doesn't see any troubling duplication of effort among the Lender's attorneys. As noted, it is an important part of a high-quality practice of law to discuss important matters over with colleagues. Such conversations can save many a misstep or even a malpractice claim. Obviously staffing can be too thick and can be abused, and the Court will not indulge such abuses. But the Court's judgment is that under the particular facts here, there was no unreasonable staffing.

### H. Fees for the hearing on fees were reasonable.

At the Hearing, the Lender asserted, and the Debtor conceded, that the Lender is also entitled to further fees incurred in the process of litigating this fee dispute.[46] Accordingly, after the Hearing, the Lender filed its Supplemental Fee Application,[47] seeking an additional award of $4,720 for eight hours of work.

---

[46] *Shree Mahalaxmi*, 522 B.R. at 914 (noting that courts may award fees to creditors under §506(b) for defending their fee applications).

[47] 110 E. 7th Street Lender LLC's Supplement to Fee Application Pursuant to 11 U.S.C. §506(B) and Rule 2016 of the Federal Rules of Bankruptcy Procedure, Dkt. No. 119.

At an additional hearing held on December 14, 2023, the Debtor challenged how these fees could all have been accrued on the day of the Hearing, and counsel for the Lender stated that the preparation time entry was intended to reflect time on the Sunday before the Hearing. So, the submitted time entries appear to be mistaken in that respect. But aside from that oversight, corrected at the second hearing, the fees seem perfectly reasonable (and indeed, counsel to the Lender was convincing when testifying that he under-billed his actual time somewhat).

In sum, the Court deems these fees reasonable and will, under the circumstances, award them—subject to the disallowance discussed below.

## I. The Debtor's other objections are overruled.

The Court has endeavored to address the Debtor's primary objections in this opinion. In its briefing and in the Hearing, the Debtor raised numerous other objections, such as some "lumping" of time, time spent on motions to expedite, and a few other matters. While the Court does not believe these objections need to be considered at length in this opinion, it has considered these other objections carefully, and in light of the Lender's evidence and testimony, and it finds that the Lender has successfully demonstrated that the challenged fees were reasonable.

## J. The redactions were unwarranted and merit a partial disallowance of fees.

The Fee Application attached time sheets with numerous redactions. Mostly these were partial redactions of either someone involved in the conversations or correspondence, or of the subject matter of the research, writing, or conversation. At the Hearing, counsel for the Lender expressed a willingness to turn over the unredacted invoices to the Court and to counsel for the Debtor. The Court then reviewed the redactions and gave the Debtor an opportunity to review them and file a further brief on any further objections or argument on the basis of the unredacted invoices. The Court has reviewed the unredacted time sheets, compared them with the redacted time sheets, and considered the arguments and evidence concerning the redacted time entries.

Redactions in time sheets submitted in support of fee applications are disfavored. In this Court's view, one principle is very clear and should be emphasized from the outset: *the best practice is to draft time entries in such a way as not to need redactions*.[48] It is usually possible to describe tasks with enough detail to permit review of fees without revealing client confidences or attorney work product.

In some rare situations, redactions may be required, for instance to protect client confidences or strategy in ongoing or potential litigation.[49] If redactions leave sufficient information to assess the reasonableness of fees, then, of course, courts can approve the time despite the redactions.[50]

---

[48] *See, e.g.*, *Ridgeway*, 2018 WL 1116531, at *10 ("The better practice is to describe the professional's services carefully so as to give information adequate for both the court's and creditors' review without disclosing confidential information."); U.S. Dep't of Just., 78 Fed. Reg. 36248 (June 17, 2013), *Appendix B—Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. 330 by Attorneys in Larger Chapter 11 Cases*, ¶ B.2.f.i (noting that "[p]rofessionals and paraprofessionals whose compensation will be paid by the bankruptcy estate know at the inception that their billing records must be publicly filed and should draft time entries and prepare invoices to both minimize redactions and avoid vague descriptions").

[49] The Court will not speculate on the range of matters that would demand redaction but believes that they would likely need to be on the level of other matters that are appropriately sealed in bankruptcy court proceedings or that are otherwise privileged from disclosure. *See* 11 U.S.C. §107; *S.E.C. v. Van Waeyenberghe*, 990 F.2d 845, 848 (5th Cir. 1993) ("[T]he district court's discretion to seal the record of judicial proceedings is to be exercised charily."); *accord Bradley on behalf of AJW v. Ackal*, 954 F.3d 216, 225 (5th Cir. 2020). *See also In re Thomas*, 583 B.R. 385, 390 (E.D. Ky. 2018) ("In bankruptcy matters, Congress has codified a strong presumption in favor of public access to all papers filed therein….").

Sealing or redacting on a temporary basis in interim fee applications might be more commonly acceptable, concerning, for instance, strategic matters such as investigations of potential claims against parties whom the movant wishes to keep unaware. But the burden would presumably be higher when those fees are presented in a final fee application. And in any case, again, the Court questions whether redactions are necessary given that careful drafting of time entries may permit the avoidance of most or all confidential information.

[50] *See, e.g., Randolph v. Dimension Films*, 634 F. Supp. 2d 779, 800 (S.D. Tex. 2009) ("Redaction of billing records is acceptable as long as the court has sufficient information to form an opinion on the reasonableness of the fees."); *Produce Pay, Inc. v. Amore Produce, LLC*, No. 7:20-CV-00293, 2021 WL 5155715, at *3–4 (S.D. Tex. July 21, 2021) (Alanis, M.J.) (noting that "[m]any of the partially redacted entries give sufficient information such that the Court can still determine that the time expended was reasonable" but "some entries are so redacted that they lack all subject matter"; disallowing fees on entries that were insufficient as redacted to permit assessment of reasonableness); *Frazin v. Haynes & Boone (In re Frazin)*, No. 02-32351, 2017 WL 7050632, at *31 (Bankr. N.D. Tex. Dec. 22, 2017) (reducing fees by more than $420,000 because of insufficient description in time entries as redacted).

17

But when fees are sought on redacted time entries, and the time entries as redacted do *not* supply sufficient information to assess the reasonableness and necessity of the fees, courts are left with a difficult choice.

Many courts deny fees outright.[51] Their reasoning, which has considerable force, is that if counsel wishes the fees to be awarded by the bankruptcy court, the proof supporting the fee application has to be submitted to public scrutiny.[52]

Other courts permit the time sheets to be submitted for in camera review.[53] The court then determines whether the time should be approved. This procedure is disfavored because not only is it highly demanding of the court, but it deprives the court of the opportunity to hear arguments from other parties in interest concerning the reasonableness of the fees.[54] That is why, even in courts that are willing to engage in this procedure when necessary, counsel is admonished to avoid it whenever possible by drafting entries without revealing matters that should remain confidential. In addition, when in camera review reveals that redactions were not necessary, some courts have significantly discounted fees.[55]

---

[51] See sources in previous footnote. *See also In re Las Vegas Monorail Co*., 458 B.R. 553, 558-59 (Bankr. D. Nev. 2011); *In re Earl Gaudio & Son, Inc.*, No. 13-90942, 2018 WL 3388917, at *6–7 (Bankr. C.D. Ill. July 10, 2018).

[52] *Las Vegas Monorail*, 458 B.R. at 558-59; *Earl Gaudio & Son*, 2018 WL 3388917, at *6–7.

[53] *See, e.g., Compass Bank v. Vey Fin., LLC*, No. 11-CV-359, 2012 WL 2397445, at *2 (W.D. Tex. June 25, 2012) (approving fees after movant "provided the Court with an unredacted copy of the billing records for the Court's in camera review"); *Ridgeway*, 2018 WL 1116531, at *9 at n. 40 (noting that "[t]he court's indulgence in opting for an *in camera* review spared [movant] from disallowance of all fees for services with redacted descriptions," and citing cases in which courts did not similarly "indulge[ ]" the applicant); *In re Henry S. Miller Com., LLC*, No. 09-34422, 2010 WL 4818096, at *5 (Bankr. N.D. Tex. Nov. 9, 2010) (summarizing "unredacted time records submitted in camera"); *In re Roberts*, No. 13-01094, 2014 WL 801495, at *1 (Bankr. D. Haw. Feb. 28, 2014) (approving fees in part "[b]ased on my review of the unredacted timesheets"); *In re Bennett Funding Group, Inc.*, 213 B.R. 234, 245 (Bankr. N.D.N.Y. 1997) ("Those entries that are made vague intentionally to protect privileged or confidential material should be noted appropriately, such as by the word 'Redacted,' and such information should be available to the court for *in camera* review if the need should arise."); *BMO Harris Bank N.A. v. Alton Bean Trucking, Inc.*, No. 6:16-CV-6118, 2019 WL 1997477, at *1 (W.D. Ark. May 6, 2019) ("Plaintiff … provided the Court with unredacted copies for in camera review.").

[54] *Cf. ResCap Liquidating Tr. v. Primary Residential Mortg., Inc.*, 59 F.4th 905, 920–21 (8th Cir. 2023) (upholding district court's finding that under the circumstances, in camera review of redacted invoices did not violate due process).

[55] *Ridgeway*, 2018 WL 1116531, at *11 (noting that the movant's "should have edited the description of services to protect genuinely privileged information," that finding that its "indifference in favor of an *in camera* review has wasted the court's more limited time and resources and warrants a $10,000 reduction in its fees").

Here, where the fee applicant abandoned the redactions, there was no need for in camera review, so the situation was somewhat different from the norm. For this reason, the Court fashioned a different approach, engaging in a review of the unredacted invoices, and also providing the Debtor with an opportunity to review the unredacted invoices and to further elaborate its objection as needed.

The Court's review shows no necessary redactions. The legal work itself appears to have been legitimate and compensable, but out of an overabundance of zeal for confidentiality, small but unnecessary redactions were made throughout the time sheets. And with the redactions, a great portion of the time was insufficiently described and the Court would have had to disapprove it; the entries often redacted at least one participant in a meeting, phone call, or email exchange, and often the topic of research or drafting was omitted.[56]

In terms of consequences: the usual remedy of disallowing large swathes of time does not seem appropriate here, where the redactions were abandoned during the Hearing. Better late than never. Yet the Debtor's counsel (and the Court) had to spend time reviewing and objecting to the unnecessarily redacted time sheets. While it is not completely clear if the Lender's counsel's time spent making the unnecessary redactions was billed, it seems likely that it was; the portion of requested fees that were related to redacting the fee application was surprisingly substantial, and the Lender's counsel did not provide an alternative explanation at the Hearing.

Accordingly, the Court will disallow a portion of the fees related to the Fee Application. Lender seeks payment of $3,594.50 in fees for 7.9 hours of work on the Fee Application. The Court believes this Fee Application was no more than a two-hour job. The Court will deny three-fourths of the fees for the work on the Fee Application—a reduction of $2,695.88.

Also, because a portion of the Hearing was spent on this aspect of the fee applications (and because, again, there was a cost to the estate in terms of the Debtor's counsel time on this unnecessary issue), the Court will disallow half of the time spent both preparing for and attending the Hearing. The Lender sought supplemental fees for both preparation for and participation in the Hearing of $4,720 for eight hours. Half of that is a reduction of $2,360.

---

[56] *See Produce Pay,* 2021 WL 5155715, at *4.

The remaining fees and expenses are allowed. Thus, the total award may be calculated as follows:

$62,257.50   Fee Application
\+ $4,720.00  Supplemental Fee Application
– $5,055.88  Disallowed Fees
**$61,921.62**   Total Allowed Fees

In addition, the **$4,754.90** in expenses will be awarded in their entirety.

## Conclusion

As noted in the Hearing, consideration of fee applications is a very important aspect of this Court's duties as established by Congress. The Court is appreciative of the effort devoted to this issue by counsel for both the Lender and the Debtor. Even when objections are overruled, as they were for the most part here, the bankruptcy process benefits from the particularly careful consideration that thoughtful objections can bring to the consideration of fee applications.[57]

Based on the Court's careful review of the Fee Application, the parties' other submissions, and the the exhibits, testimony, and arguments at both hearings, the Court finds that the Lender has borne its burden and demonstrated that the fees were reasonable as to $61,921.62 in fees and $4,754.90 in expenses.

---

[57] Chief Judge Gargotta's recent comments ring true: "Few matters before bankruptcy courts are as distasteful as the duty to examine transactions between a debtor and its attorney. . . Fulfilling this duty, though unpleasant, is also one of the most integral parts of the bankruptcy system." *In re Chris Pettit & Assoc., P.C.*, No. 22-50591, 2022 WL 17722853, at *8 (Bankr. W.D. Tex. Dec. 13, 2022).

Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED AS FOLLOWS:**

    1.    The Lender's Fee Application pursuant to 11 U.S.C. §506(b) and Rule 2016 of the Federal Rules of Bankruptcy Procedure is GRANTED in part as follows: the amount of $61,921.62 in reasonable compensation for fees and $4,754.90 in reasonable and necessary expenses.

    2.    Any other relief requested in the Fee Application is hereby denied.

# # #